**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: _____**

**HARTZELLA VENTURES LIMITED,**

**Plaintiff,**

**v.**

**EMMANUIL GRINSHPUN,**

**Defendant.**
_____/

**<u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>**

Plaintiff Hartzella Ventures Limited ("**Hartzella**") sues Defendant Emmanuil Grinshpun ("**Grinshpun**"), and states:

## I.   NATURE OF THE ACTION

1.      This action arises from a series of loan agreements whereby over $6.6 million is owed by the borrower Grinshpun. Pursuant to the loan agreements and Grinshpun's personal guaranty, Grinshpun is personally liable for repayment of $6.6 million to Hartzella, is in default, and he has not raised any defenses. Grinshpun is responsible for repayment based on both contractual and quasi-contractual claims for relief asserted hereunder.

2.      The loans and funds paid to Grinshpun are well-documented by wire transfer records (see **Exhibit A**) as well as the terms of the loan agreements and the Grinshpun Guaranty (as defined below), all of which are annexed hereto as **Exhibits B** through **I**.

3.      Among these loans and wire transfer records, as further detailed below, was a payment to fund Grinshpun's purchase of an expensive Miami penthouse apartment for over $3.7 million.  Property records confirm that Grinshpun still maintains and resides at the Miami

penthouse apartment. The payment for the Miami penthouse was made directly to the title company in Florida.

4.      For the reasons that follow, the case requires immediate injunctive relief given the strong likelihood that the Defendant will seek to encumber, transfer, dispose of, and otherwise shield assets out of the reach of his creditors and outside the jurisdiction of this Court, absent such relief.

5.      Recent investigation has uncovered that Grinshpun, a U.S. citizen and Miami resident, is associated with major money laundering criminal violations, Russian organized crime, and multiple cases involving allegations of extortion, money laundering, fraud, blackmail and other crimes.

6.      First, Grinshpun has been and continues to serve as the Vice President of Latvia's Rietumu Bank, which has faced millions of dollars in fines for its involvement in money laundering scandals.[1] The Defendant has been and continues to be "responsible for attracting foreign clients and international investment projects, sales of banking products and services"[2] at Rietumu Bank and has proclaimed in the press that he is investing in the Riga's port reconstruction projects,[3] as also detailed below.

---

[1] Investigative reporters have reported extensively on this scandal in the press, including as to uncovering of documents demonstrating that the US-based banks and FinCEN considered Latvia a high-risk jurisdiction, and regularly reported on suspicious transactions which flowed through banks such as Rietumu Bank. This bank also has been required to pay many millions of dollars in fines.

[2] *See* https://www.rietumu.com/documents/1481994_sustainability_2021_eng.pdf

[3] *See* https://timebusinessnews.com/emmanuil-grinshpun-on-the-riga-port-city-project/

7.      Second, according to reports from credible investigative journalists, Grinshpun was directly involved in the Russian Laundromat scandal through various other entities, as also further detailed below.[4]

8.      Other reports have tied Grinshpun to renowned criminals, including members of Russian organized crime.[5] In particular, Grinshpun is known to have had close business dealings with Veaceslav Platon, who, upon information and belief, is considered by Moldovan law enforcement to be a mastermind of financial crime who has ties to the $1 billion money laundering scandal involving disappearance of funds from Moldovan banks.[6]

9.      Grinshpun has also been known to operate an intricate web of offshore companies (*see infra*) that he controls, including certain companies uncovered in the recent "Pandora Papers" leak associated with illicit movement of funds.[7]  Grinshpun is known to operate companies and maintain bank accounts for, inter alia, companies in the United Kingdom, Moldova, Latvia, Georgia, Cyprus, and other jurisdictions.

10.      There is therefore great risk, as further set forth below, that but for injunctive relief being sought hereunder, Grinshpun, who is also a citizen of Romania and Moldova, in addition to being a U.S. citizen, shall render any judgment against him uncollectable and shall deal with or otherwise move all available movable assets outside the reach of creditors, flee the jurisdiction and/or otherwise abscond with the funds.

---

[4] *See* https://www.occrp.org/en/investigations/5617-platon-s-money

[5] *See* https://ruscrime.com/criminal-kazan-and-the-jewish-elite/

[6] *See also* https://committees.parliament.uk/writtenevidence/107148/pdf/

[7] https://offshoreleaks.icij.org/nodes/240104689

## II.  <u>THE PARTIES, JURISDICTION AND VENUE</u>

11.     Plaintiff Hartzella is a registered company in the Republic of Seychelles.

12.     Defendant Grinshpun is a U.S. citizen and resident of Miami, Florida. Grinshpun also holds Moldovan and Romanian citizenships. Grinshpun resides principally at the Collins Avenue Penthouse (as defined below) inside the Turnberry Ocean Colony, which he purchased with funds loaned to him by the Plaintiff, as further discussed herein. Grinshpun, in prior litigation in this Court, admitted to being a resident in this District. *See infra*, discussion of Grinshpun's Florida residence and his involvement in criminal activities.

13.     The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.

15.     This Court has jurisdiction over the Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) based on Plaintiff's service of summons on Defendant and the fact that Defendant is subject to general jurisdiction in the State of Florida. Grinshpun resides and regularly does business in his individual capacity in this District. He serves as the Honorary Consul for Kazakhstan in Florida[8] and is also deeply involved in the South Florida Chabad. Moreover, Grinshpun's mobile telephone number, which he used to communicate with Plaintiff and/or its representative, uses a Miami area code of 305. This is also the phone number that he lists for his Kazakhstan consulate activities in Florida.

---

[8] *See* https://www.kazconsulate.com/en/embassy-consulates-in-usa/kazakhstan-honorary-consul-in-florida?highlight=WyJjcmlmluc2hwdW4iXQ==

4

16.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because (i) Grinshpun resides in this District; (ii) substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in this District, and/or (iii) there is no district in which an action may otherwise be brought pursuant to 28 U.S.C. §1391, and (iv) Defendant is subject to this Court's personal jurisdiction.

### III.   STATEMENT OF FACTS

**A. Grinshpun Personally Owes Over $3.2M to Plaintiff under the Grinshpun Guaranty and the Pronicom Loan Agreement**

17.     On September 22, 2015, Tick Tock Ventures Ltd. ("**Tick Tock**"), a company incorporated and registered in the Commonwealth of Bahamas, entered into a loan agreement with Pronicom Trading Limited ("**Pronicom**"), which was also incorporated and registered in the British Virgin Islands ("**BVI**"). *See* **Exhibit B** (hereinafter, the "**Pronicom Loan Agreement**"). Plaintiff Hartzella is the assignee of the debt due under the Pronicom Loan Agreement and of the benefits of the Pronicom Loan Agreement, and Mr. Grinshpun owes over $3.2 million under this agreement and his personal guaranty thereunder.

18.     Pursuant to the terms of Pronicom Loan Agreement, Tick Tock, as the lender thereunder, loaned $1.7 million to Pronicom and the loan subject to twelve (12%) annual interest. Mr. Grinshpun, contemporaneously with the execution of the Pronicom Loan Agreement, executed a Deed of Guaranty and Indemnity (the "**Grinshpun Guaranty**") whereby he personally guaranteed the repayment of the loan made to Pronicom immediately upon demand as the principal obligor. *See* **Exhibit C,** Grinshpun Guaranty, ¶3.1 and ¶3.2.

19.     According to contemporaneous emails and wire transfer records, the loan was actually advanced to Mr. Grinshpun personally, and payment was made to Pronicom's Cyprus

bank account at Mr. Grinshpun's direction.  On October 10, 2015, Tick Tock initiated a wire transfer in the amount of $1.7M to Grinshpun through Pronicom. See **Exhibit A**, p. 16-18.

20.     Pursuant to Section 3.4 of the Grinshpun Guaranty, the obligations of Grinshpun (as Guarantor) are continuing in nature, and these obligations "extend to the ultimate balance of all sums payable to the Borrower under the Loan Agreement and/or the Guarantor under this Deed, notwithstanding any intermediate settlement and shall not be considered satisfied by any intermediate payment or satisfaction of all or any of the obligations of the Borrower and the Guarantor, and shall continue in full force and effect until final payment in full of all amounts owing in respect of all such obligations." *See id.*

21.     Pursuant to Section 3.9, Mr. Grinshpun waived the right he may have had of first requiring the Beneficiary (or any trustee or agent) (as defined in this Grinshpun Guaranty)[9] to proceed against or enforce any other rights or security or claim payment from any person before claiming from Mr. Grinshpun as Guarantor.

22.     Pursuant to the dispute resolution claim, section 10.1 of the Grinshpun Guaranty, there is no limitation to proceeding with this action in this forum (as the clause specifically states that "nothing contained in this clause 10 shall be taken to have limited the right of any Party to proceed in the courts of any other competent jurisdiction.").

23.     In addition, pursuant to section 10.2, Mr. Grinshpun specifically waived any defenses to injunctive relief and pre-judgment attachment proceedings.

24.     By a Deed of Assignment ("**the Deed of Assignment**") December 15, 2015, Tick Tock assigned and transferred to Plaintiff Hartzella (as Assignee) all of its title, interest, and

---

[9] Beneficiary is a defined term in the Grinshpun Guaranty and the Beneficiary Group includes all parent companies and subsidiaries.

benefits in the Pronicom Loan Agreement, and all additional agreements, including the Grinshpun Guaranty. This assignment was of the benefits of loan agreement and guarantee as well as the liabilities thereunder. *See* **Exhibit D**.

25. At this point in time, Mr. Grinshpun was personally liable for the debt, which is specifically refenced in this Deed of Assignment, and the corresponding Notice of Assignment, which was served on him. *See* **Exhibit D**. By virtue of the service of Notice of Assignment, the assignment effected by the Deed of Assignment became a "legal" (as opposed to equitable) assignment under section 136 of the English Law of Property Act 1925.

26. On March 1, 2016, Hartzella and Pronicom executed an addendum extending the repayment date under the Pronicom Loan Agreement to December 31, 2018. *See* **Exhibit E**. Grinshpun was provided with notice of the assignment and the addendum.

27. Despite demands for payment, Mr. Grinshpun remains obligated to pay more than $3.2 million (calculated based on principal amount and accumulated interest) under the terms of the aforementioned Grinshpun Guaranty and Pronicom Loan Agreement.

**B. Grinshpun Personally Owes Over $1.4M to Plaintiff under the Merkel Loan Agreement**

28. On June 25, 2014, over a year before the Pronicom Loan Agreement, Mr. Grinshpun personally entered into a loan agreement (the "**Merkel Loan Agreement**") with Merkel Business Overseas, S.A. ("**Merkel**"). The loan amount was up to USD $3,769,000.00. Pursuant to section 2.1, the term for repayment was up to three (3) years but could be extended for up to ten (10) years. *See* **Exhibit F**.

29. Section 3 of the Merkel Loan Agreement specifically provides that this loan was for the acquisition of the apartment at Turnberry Ocean Colony, 16051 Collins Ave, Unit #1003

N, Sunny Isles Beach, FL 33160-4514 and Cabana 01N in Miami, Florida (the "**Turnberry Property**").

30.      The wire transfer record, dated June 26, 2014, confirms that payment was made to the account of Global America Title Services, LLC, in Hollywood, Florida, directly for payment for the Turnberry Property purchased by Mr. Grinshpun, personally.  *See* **Exhibit A**.

31.      Compensation and/or indemnification rights under the Merkel loan agreement specifically includes collection of all interest (contractually set at 3% per annum), attorneys' fees and costs.

32.      As noted above, a year later, when Mr. Grinshpun executed the Grinshpun Guaranty, and guaranteed repayment of "the ultimate balance of all sums payable to the Borrower under the Loan Agreement and/or the Guarantor under this Deed." Grinshpun also reaffirmed payment under the Merkel Loan at this time.

33.      On May 19, 2023, Merkel assigned and transferred to Plaintiff Hartzella (as Assignee) all of its title, interest, and benefits in the Merkel Loan Agreement. *See* **Exhibit G**.

34.      Mr. Grinshpun remains indebted over $1.4 million to Hartzella under the terms of the Grinshpun Guaranty and the Merkel Loan Agreement, plus accruing interest, attorneys' fees and costs.

**C. <u>Grinshpun Personally Owes Over $284,000 to Plaintiff under the Finstar Loan Agreement</u>**

35.      On September 6, 2018, Mr. Grinshpun personally entered into a loan agreement (the "**Finstar Loan Agreement**") with Finstar Management (Overseas) Limited BVI ("**Finstar**") pursuant to which he borrowed $250,000 to be repaid by September 8, 2020.

36.      On May 19, 2023, Merkel assigned and transferred to Plaintiff Hartzella (as Assignee) all of its title, interest, and benefits in the Merkel Loan Agreement. *See* **Exhibit H**.

D.  **Grinshpun Personally Owes Over $1.6M to Plaintiff under the Grinshpun Guaranty and the Miser Loan Agreements**

37.     In addition, Mr. Grinshpun, through a series of affiliated companies, in 2014, entered into five (5) other loan agreements (hereinafter referred to as the "**Miser Loan Agreements**"). Specifically, on September 11, 2014, Miser Development Limited ("**Miser**") entered into four different loan agreements with four different companies, as follows:

• Term loan to Chiswick Group Services S.A. of up to $163,275 for a year;
• Term loan to MetalForum LP of up to $290,383 for a year;
• Term loan to SohoTrack Impex LLP for up to $200,000 for a year; and
• Term loan to Tidis Limited for up to $46,342 for a year.

True and correct copies of the Miser loans are annexed as **Exhibit I**.

38.     Mr. Grinshpun specifically requested to make the loans payable to these particular companies.

39.     A couple weeks prior, on August 25, 2014, Miser also entered into a term loan with TradeMarket Networks LP for up to $145,500 for two (2) years.

40.     On May 19, 2023, Miser assigned and transferred to Plaintiff Hartzella (as Assignee) all of its title, interest, and benefits in the Miser Loan Agreements. *See* **Exhibit H**.

41.     Mr. Grinshpun, pursuant to the Grinshpun Guaranty is also obligated to repay over $1.6 million under these loans to Hartzella, plus accruing interest, costs and attorneys' fees.

42.     The total liability of Mr. Grinshpun amounts to over $6.6 million under all the aforementioned loan agreements for which he is liable personally under the terms of the Grinshpun Guaranty.

43.     A summary chart of these liabilities and debts, in which interest and costs, including attorneys' fees are accruing, is presented below:

| Original lender | Borrower | Principal | Interest | Total (USD) |
|---|---|---|---|---|
| Merkel | Emmanuil Grinshpun | 1,154,450 | 316,476 | 1,470,926 |
| Miser | TRADEMARKET NETWORKS L.P. | 145,500 | 126,923 | 272,423 |
| Miser | SOHOTRACK IMPEX LLP | 200,000 | 199,501 | 399,501 |
| Miser | CHISWICK GROUP SERVICES SA | 163,275 | 162,507 | 325,782 |
| Miser | TRIDIS LIMITED | 46,342 | 46,124 | 92,466 |
| Miser | METALFORUM LP | 290,383 | 289,018 | 579,401 |
| Tick Tock | PRONICOM TRADING LIMITED | 1,700,000 | 1,553,753 | 3,253,753 |
| FMOL (BVI) | Emmanuil Grinshpun | 250,000 | 34,993 | 284,993 |
| **TOTAL LOANS:** | | 3,949,950 | 2,815,571 | 6,679,249 |

E.  **Mr. Grinshpun's Florida Residence and Involvement with Financial Crime**

44.     Grinshpun is the sole owner of Units 1002 and 1003, 16051 Collins Ave, Sunny Isles Beach, Florida (the Turnberry Property), situated inside the Turnberry Ocean Colony, a coastal condominium complex overlooking Miami Beach which was built in 2006.

45.     Grinshpun acquired Unit 1003 in June 2014 without a mortgage for USD $3.75 million, upon information and belief, using the funds loaned to him pursuant to the aforementioned loan.

46.     Grinshpun also owns another apartment, Unit 1903, 17375 Collins Avenue, Sunny Isles Beach, Florida 33160-4310 ("**Unit 1903**").

47.     Since 2012, Grinshpun has also served as a board member of the Chabad Russian Centre of South Florida.

48.     Mr. Grinshpun has also maintained at least two companies in Florida, according to official records from the Florida Division of Corporations: New World Partners LLC and Gurkha

Eastern Distribution Inc. Both of these entities appear to have been administratively dissolved for failure to file an annual report.

49.     In prior litigation where Mr. Grinshpun was a defendant in the Southern District of Florida, U.S. District Court, Mr. Grinshpun admitted that he was a resident of Florida. *See Platon v. Grinshpun*, Southern District of Florida (Miami); Case No. 15-cv-20824-JAL; Dkt. 30.

50.     Grinshpun is known to have been associated with criminals in Moldova and is accused of, inter alia, extortion and blackmail.[10]

51.     According to certain press reports, Grinshpun is mentioned in Laundromat, and is a friend and partner of Veaceslav Platon, who was called by Moldovan law enforcement agencies a genius of financial crimes.[11] The two partners had various financial dealings together and Grinshpun owed substantial debt to Platon as of 2014. It now appears, upon information and belief, from the uncovered press reports, that Grinshpun likely used funds that he obtained from, in alia, Miser, to pay his $6.3 million debt to Platon.

52.     Grinshpun was also now involved in a case involving blackmail and extortion. Specifically, in the Section 1782 application for foreign discovery brought by Anatolie Stati, the case is described as involving "a Moldovan businessman who held interests in substantial oil fields in the Republic of Kazakhstan, which were wrongly expropriated by Kazakhstan resulting in the state's obligation to pay a nearly $500 million international arbitral award issued by the Stockholm Chamber of Commerce", to take discovery from The Clearing House Payments Company LLC for use in legal proceedings in Moldova alleging "abuse of official authority, blackmail and attempted blackmail" against Vladimir Voronin, Oleg Reidman, **Emmanuel Grinshpun**, Nursultan

---

[10]     *See   e.g.,*   https://www.occrp.org/en/investigations/5617-platon-s-money;   see   also https://ruscrime.com/criminal-kazan-and-the-jewish-elite/

[11] See *id*.

Nazarbayev, Karim Massimov, Timur Kulibayev, Kairat Boranbayev, Arvind Ticku, Alexander Mashkevich, Kanatbek Safinov, Arman Rakhimov, Serik Rakhimov, Grigory Andreev, Andrey Kiselyov, Marat Beketayev, Ruslan Ashenov, Orynbasar Kubygul, Almat Madaliyev, and others, filed at the U.S. District Court for the Southern District of New York.

53.    Also in a Section 1782 application (Case No. 22-mc-21672-DPG), Grinshpun is accused of, in alia, "to have been involved in soliciting and ultimately obtaining the improper letter that was delivered by Moldovan President Voronin to Kazakh President Nazarbayev on October 6, 2008, and to have had further direct involvement in various meetings with the Applicant thereafter, which involved threats by high-ranking parties within the Republic of Kazakhstan to expropriate the Statis' interests within the Republic unless the Applicant agreed to voluntarily cede 50% of his oil interests in Kazakhstan." See Dkt. 1. The damages at issue in criminal and civil proceedings in Moldova, and the arbitration award for over $500 million.

54.    Grinshpun has been identified as operating an intricate web of companies associated with the notorious "Pandora Papers" leak:



***See*** ***https://offshoreleaks.icij.org/nodes/240083266***

55.     Grinshpun, upon information and belief, is maintaining businesses worldwide, including but not limited to in Florida, Romania, Moldova, Latvia, and Cyprus.  Grinshpun has close ties to banks in Moldova and Latvia, and currently is leading investments into the Riga, Latvia port.  There is therefore great risk that the Defendant shall seek to deal with and move assets and/or otherwise render any judgment of this Court ineffectual but for injunctive relief.

56.     All conditions precedent to bring this action have either already occurred or have been waived.

## <u>COUNT I</u>
**(Breach of Grinshpun Guaranty Based Upon Default of Pronicom Loan Agreement)**

57.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

58.     The Grinshpun Guaranty, and each of the Pronicom Loan Agreement, constitute valid and enforceable contracts.

59.     Mr. Grinshpun breached the terms of the Grinshpun Guaranty and the Pronicom Loan Agreement by failing to repay the debts due under the aforementioned loan agreements.

60.     As a result of Mr. Grinshpun's breach of contract of the Grinshpun Guaranty, and each of the aforementioned loan agreements, Plaintiff has been damaged in amount that exceeds $3.2 million, plus accruing interest, attorneys' fees, expenses and costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant for damages under the contracts, plus pre-judgment interest, plus attorneys' fees and costs for having to bring this lawsuit, and such further relief as this Court deems just, fair and equitable.

## COUNT II
### (Breach of Contract as to Merkel Loan Agreement)

61.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

62.     The Merkel Loan Agreement constitutes a valid and enforceable contract.

63.     Mr. Grinshpun breached the terms of the Merkel Loan Agreement by failing to repay the debts due under the aforementioned loan agreement.

64.     As a result of Mr. Grinshpun's breach of contract of the Merkel Loan Agreement, Plaintiff has been damaged in amount that exceeds $1.4 million, plus accruing interest, attorneys' fees, expenses and costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant for damages under the contracts, plus pre-judgment interest, plus attorneys' fees and costs for having to bring this lawsuit, and such further relief as this Court deems just, fair and equitable.

## COUNT III
### (Breach of Contract as to Miser Loan Agreements and the Grinshpun Guaranty)

65.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

66.     The Miser Loan Agreements each constitute a valid and enforceable contracts.

67.     Mr. Grinshpun breached the terms of the Miser Loan Agreements by failing to repay the debts due under the aforementioned loan agreement.

68.     As a result of Mr. Grinshpun's breach of contract of the Miser Loan Agreements, Plaintiff has been damaged in amount that exceeds $1.6 million, plus accruing interest, attorneys' fees, expenses and costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant for damages under the contracts, plus pre-judgment interest, plus attorneys' fees and costs for having to bring this lawsuit, and such further relief as this Court deems just, fair and equitable.

## COUNT IV
**(Breach of Contract as to Finstar Loan Agreement and the Grinshpun Guaranty)**

69.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 above as if fully set forth herein.

70.     The Finstar Loan Agreement constitutes a valid and enforceable contract.

71.     Mr. Grinshpun breached the terms of the Finstar Loan Agreements by failing to repay the debts due under the aforementioned loan agreement.

72.     As a result of Mr. Grinshpun's breach of contract of the Finstar Loan Agreements, Plaintiff has been damaged in amount that exceeds $284,000, plus accruing interest, attorneys' fees, expenses and costs.

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant for damages under the contracts, plus pre-judgment interest, plus attorneys' fees and costs for having to bring this lawsuit, and such further relief as this Court deems just, fair and equitable.

## COUNT V
**(Unjust Enrichment)**

73.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 5-16, 44-55 above as if fully set forth herein.

74.     As an alternative to Counts I through IV, Plaintiff Hartzella conferred financial benefits on Defendant Grinshpun through the payment of principal (see chart above), which with interest has now accrued to more than $6.6 million.

75. Specifically, the payments are all documented by wire transfer records of funds sent to Mr. Grinshpun's designated accounts and those that he controlled. For example, he specifically directed payment to be made to Global America Title Services LLC for the purchase of his Miami penthouse and he thus received a benefit of at least USD $3,769,000.00 by way of this payment. *See* **Exhibit A**, p. 12.

76. Upon information and belief, Mr. Grinshpun also used the other moneys that he obtained from Plaintiff to fund his lavish lifestyle in Miami and make expensive renovations to his Miami penthouse.

77. Grinshpun had knowledge of the funds provided by Plaintiff and the conditions upon which the benefits were accepted.

78. Grinshpun was unjustly enriched through use of these benefits, and accepted and retained these benefits.

79. It would be inequitable and unjust for Grinshpun to retain the financial benefits that Hartzella conferred without performing the obligations required for conferral of the financial benefit.

80. Plaintiff has been damaged by Defendant's acceptance and ongoing retention of the financial benefits that Plaintiff provided to him.

## COUNT VI
### (Constructive Trust)

81. Plaintiff repeats and re-alleges paragraphs 1 through 5-16, 44-55 as if fully set forth herein.

82. Upon information and belief, Defendant acquired and/or renovated the Turnberry Property and/or Unit 1903 in Florida, through unjustly enriching himself by misappropriating the

funds derived from the loan by Plaintiff to him and/or companies that he controlled. *See* **Exhibit A**.

83.     Equity and good conscience require that Defendant is ordered to hold the Florida real estate, including Turnberry Property and/or Unit 1903, for Hartzella's benefit.

84.     Equity and good conscience require that the real estate is not further encumbered to remove equity from the Florida real estate for Defendant's benefit.

## COUNT VII
### (Promissory Estoppel)

85.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 5-16, 44-55 above as if fully set forth herein.

86.     As an alternative to Counts I through IV, Plaintiff alleges that Grinshpun's promises to repay the funds that Plaintiff provided to him were made to induce Plaintiff to provide more funds, based on trust.

87.     Grinshpun should be estopped from denying that Plaintiff suffered damages as a result of his failure to pay back the funds.

## COUNT VIII
### (Moneys Had and Received)

88.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 5-16, 44-55 above as if fully set forth herein.

89.     Plaintiff claims that Grinshpun has received money which he ought to refund to Plaintiff.

90.     The fact that Defendant received the money is confirmed by wire transfer records annexed hereto as **Exhibit A**.

91.     Grinshpun received the money as the result of his request for loans from Plaintiff and its affiliate assignors of the various loan agreements.

92.     The circumstances are such that Defendant should, in all fairness, be required to return the money to Plaintiff.

<u>COUNT IX</u>
**(Piercing the Corporate Veil and Alter Ego Liability)**

93.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56  above as if fully set forth herein.

94.     Grinshpun dominated and controlled Pronicom and the companies that he put forward under the Miser Loans were structured in a purposefully fraudulent manner.

95.     Pronicom, Chiswick, MetalForum, SohoTrack, Trademarket and Tridis's (collectively, "Sham Companies") separate identity was not sufficiently maintained, and

96.     The Sham Companies lacked an existence independent from Grinshpun and/or nominees that he assigned to them.

97.     At least two of these companies – MetalForum and Trademarket, have been reported as being involved in the Moldovan money laundering laundromat scheme.[12]

98.     The corporate form of the Sham Companies was used for a fraudulent or improper purpose.

99.     Plaintiff was harmed by the fraudulent or improper use of the corporate form of the Sham Companies and liability should be imposed on Grinshpun and he should be estopped from arguing that he is not personally liability for repayment of the funds that he received.

---

[12]  See  e.g.,  https://www.nakedcapitalism.com/2015/06/the-bank-fraud-in-moldova-and-20000-opaque-british-corporations.html

## COUNT X
### (Equitable Lien)

100.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 5-16, 44-55 above as if fully set forth herein.

101.   Upon information and belief, Defendant acquired and/or renovated the Turnberry Property and/or Unit 1903, through unjustly enriching himself by misappropriating the funds derived from the loan by Plaintiff to him and/or companies that he controlled.

102.   Defendant represented that he would pay the money back for the funds used to purchase and/or renovate the Turnberry Property and/or Unit 1903.

103.   There is a fair nexus between the funds accepted by Defendant and the funds used to acquire and/or renovate the Turnberry Property and/or Unit 1903.

104.   Defendant committed affirmative acts of deception by accepting the funds and failing to repay money used for the acquisition and/or renovation of the real estate.

105.   Equity and good conscience require that Defendant is ordered to hold the real estate, including the Turnberry Property and/or Unit 1903, for Hartzella's benefit.

106.   Equity and good conscience require that the real estate is not further encumbered to remove equity from the Florida real estate for Defendant's benefit.

107.   As a direct result of Defendant's conduct, Plaintiff has been damaged, Plaintiff has no adequate remedy at law, and require the imposition of an equitable lien against the Turnberry Property and/or Unit 1903 to protect Plaintiff's interests.

WHEREFORE, Plaintiff requests that this Court enter judgment as follows:

(a) award compensatory damages to Plaintiff in the amount of $6.6 million;

(b)  Issue an injunction and temporary restraining order against disposition or transfer of the real or personal property by Defendant, and levying execution on the real property or

its proceeds and order issuance and recordation of a lis pendens on all of the Defendants'

Florida real estate;

(c) Impose a constructive trust over all real estate properties that was obtained by defendant

through unjust enrichment and fraudulent conversion of Plaintiff's funds;

(e) Award Plaintiff attorney's fees and costs; and

(f) Order such other and further relief as the Court deems necessary and just.

Respectfully submitted,

Dated:  May 25, 2023

> **ASSOULINE & BERLOWE, P.A.**
> Miami Tower
> 100 SE 2nd Street, Suite 3105
> Miami, FL 33131
> Telephone: (305) 567-5576
>
> By: _Greg M. Popowitz_____
> Eric N. Assouline (FL Bar #106143)
> ena@assoulineberlowe.com
> Greg M. Popowitz (FL Bar #70313)
> gmp@assoulineberlowe.com
>
> and
>
> **BENAUR LAW LLC**
>
>
> _____
> (www.benaurlaw.com)
> George Benaur (GB1224)
> 43 W 43rd STREET
> New York, New York 10036
> Cell: (609) 216-6105
> Email: george@benaurlaw.com
>
> *Pro Hac Vice Application Pending*
>
> *Counsel for Plaintiff*

## **VERIFICATION**

I, Alexey Karpov, am the Legal Counsel and Representative of Hartzella Ventures Limited, the Plaintiff in the within action. I have read the foregoing complaint and know the contents thereof, based on my review of corporate records and consultation with the client team. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

Dated: May 24, 2023